Tomoyuki **TAKAHASHI**, Petitioner,

v.

**DISTRICT OF COLUMBIA DEPARTMENT OF HUMAN SERVICES,** Respondent.

No. 06–AA–1382.

District of Columbia Court of Appeals.

Argued March 20, 2008.

Decided May 22, 2008.

---

Joseph R. Cooney, for petitioner.

Richard S. Love, Senior Assistant Attorney General, with whom Linda Singer, Attorney General of the District of Columbia at the time the brief was filed, Todd S. Kim, Solicitor General, and Edward E. Schwab, Deputy Solicitor General at the time the brief was filed, were on the brief for respondent.

Before FISHER and BLACKBURNE–RIGSBY, Associate Judges, and KERN, Senior Judge.

BLACKBURNE–RIGSBY, Associate Judge:

Petitioner Tomoyuki Takahashi petitions for review of the Administrative Law Judge's ("ALJ") denial of his request for reimbursement from the District of Columbia Department of Human Services Rehabilitation Service Agency ("RSA") for tuition and other costs for his Fall 2005 semester at Beacon College.[1] At issue is whether RSA was required to pay fall semester benefits (tuition and costs) to Mr. Takahashi when he enrolled and obligated himself to pay the tuition prior to applying for and seeking approval from RSA for the benefits.

We conclude that the ALJ's determination that RSA was not required to pay these benefits was not arbitrary and capricious. Further, the ALJ's conclusion that RSA fulfilled its obligations under the Rehabilitation Act of 1973, as amended (the "Rehabilitation Act") to provide transition services to children and adults under an Individualized Plan of Employment (the "Plan") by complying with the Memorandum of Agreement ("Agreement") among the various agencies in the District of Columbia government charged with providing comprehensive services to individuals with disabilities, was supported by substantial evidence.

The Agreement required District of Columbia Public Schools ("DCPS") to be the lead agency for the purpose of identifying those students in need of transition services and referring them to RSA for transition and vocational benefits. Mr. Takahashi contends that RSA, not DCPS, was required under the Rehabilitation Act to have procedures to identify and complete the Plan for eligible students prior to their leaving school. He argues that as a result of RSA's failure to implement such procedures, a timely Plan was not completed on his behalf, and consequently, RSA's determination not to pay for all of his college expenses was erroneous. We are not persuaded by this argument. Accordingly, we affirm.

---

1. Mr. Takahashi is a college student diagnosed with Attention Deficit Hyperactivity Disorder, Learning Disability, and Asperger's Syndrome. Beacon College is a college located in Leesburg, Florida that was designed to educate students with disabilities. Beacon College specifically serves students such as Mr. Takahashi who have been diagnosed with Asperger's Syndrome.

## I.

### A. Factual Background

From 1998 through 2005, Mr. Takahashi attended George Washington Community Preparatory School ("GW Prep") a private secondary school in Springfield, Virginia, as a special-education student placed by the DCPS. The placement was funded by DCPS through the Individuals with Disabilities Education Act ("IDEA"). 20 U.S.C. §§ 1400–1490. In 1999, a number of service agencies including DCPS, RSA, and four other service providers entered into an Agreement, in an effort to identify students with disabilities expected to exit DCPS within two years and to provide those students with transition services into the adult community. The Agreement delineates the roles and responsibilities of each of the agencies that are signatories to the agreement. DCPS is designated in the Agreement as the lead agency responsible for identifying students within DCPS who may qualify for the RSA program in order to timely begin the transition services. Once a referral is received, RSA representatives attend the Individualized Education Plan ("IEP") meetings, when invited by DCPS, and assess the students to determine their eligibility to receive adult transitional and rehabilitative services.

Mr. Takahashi graduated from GW Prep in 2005 without ever being identified by DCPS as a student who might qualify for RSA benefits. In addition, DCPS never provided information about RSA to Mr. Takahashi or his mother. RSA was never aware that he was in the DCPS system, and therefore RSA never assessed him for transition services. In June 2005, Mr. Takahashi applied and was accepted to attend Beacon College in Florida. His mother, through her efforts to research public assistance programs to help fund his education, learned about RSA. On August 22, 2005, she applied for RSA benefits on Mr. Takahashi's behalf. At this point in time Mr. Takahashi was scheduled to begin his first semester at Beacon College a week later.

When RSA received Mr. Takahashi's application, it scheduled a two-day orientation session during the week of September 20, 2005 for him to learn about the RSA program; subsequently assigned him a vocational counselor; and had him take a psychological evaluation that confirmed his diagnosis of Attention Deficit Hyperactivity Disorder, Learning Disability, and Asperger's Syndrome. After a psychiatric evaluation on November 8, 2005, Mr. Takahashi was approved for his vocational goals. RSA did not immediately grant him services, but ultimately RSA formulated the Plan in July 2006, authorizing payments for him to attend Beacon College in Spring 2006. RSA, however, declined to reimburse him for his educational costs for Fall of 2005 on the grounds that Mr. Takahashi incurred that debt before the date of application for RSA benefits and before the date of formal approval of his Plan. RSA conceded that it should have completed the Plan no later than December 2005, which is why it agreed to pay for the Spring 2006 semester.

### B. The ALJ's Order

On June 30, 2006, Mr. Takahashi filed a petition with the OAH challenging RSA's decision not to reimburse him for the expenses incurred for the Fall 2005 semester. The ALJ framed the issues before the OAH as follows:

> First, is the RSA program obligated (and if so, to what extent is it obligated) to identify a minor [child who is a] disabled student as a candidate for RSA benefits while he is receiving special education benefits? Second, assuming the answer to the first sub-issue is no, is the

RSA program required to fund an educational program that the applicant has already committed himself to, but he has not yet entered the program as of the date of application.

In response to the first issue, the ALJ concluded that RSA is obligated to provide vocational rehabilitation services to eligible adults with disabilities, including transition services that facilitate the achievement of the employment outcome identified in the Plan, once such students in the special education system are identified to RSA by DCPS. Mr. Takahashi argued that the statute required RSA, in the first instance, to identify all students with disabilities who may qualify for vocational rehabilitation services. The ALJ concluded that RSA was not responsible in the first instance for identifying Mr. Takahashi, a minor disabled student who was receiving special education services from DCPS, as a student who might be eligible to receive RSA benefits. The ALJ concluded that the Rehabilitation Act, 29 U.S.C. § 721(a)(11)(D), required coordination with educational and other officials in order to facilitate the timely transition of students with disabilities from educational to vocational rehabilitative services.

RSA complied with the Rehabilitation Act's requirement for interagency coordination, the ALJ concluded, by clearly setting forth the obligations and responsibilities of each of the relevant and responsible agencies in the Agreement. Specifically, RSA would fulfill its statutory obligations by: (1) assigning rehabilitation counselors to the "city-wide" high schools, both public and private; (2) providing education and technical assistance to staff, students, and families; and (3) attending IEP meetings when invited to do so by DCPS. RSA's

fulfillment of these duties was dependent on RSA receiving from DCPS referrals with identifying information about the disabled students in need of RSA services. Thus, the ALJ concluded that RSA was not the agency responsible for the failure to identify Mr. Takahashi's transition needs, and determined that DCPS was primarily responsible for the neglect.[2]

The second issue the ALJ considered was whether RSA was required to fund the education program even though Mr. Takahashi had already applied and been accepted before applying to and receiving approval for RSA services. The ALJ concluded that RSA is required to issue benefits only to the extent available and in compliance with the fiscal restraints of the federal Rehabilitation Service Agency program and the District's Anti–Deficiency Act. 34 C.F.R. § 348 (2007). Therefore, RSA is required to determine an individual's eligibility for RSA benefits within sixty days after the individual has submitted an application. Before RSA is obligated to fund any particular service, it must work with the individual to develop a written Plan that sets forth the employment outcome; service providers; and methods to be used to procure the requisite services. The ALJ noted that there is no entitlement to receive RSA benefits in contrast to the IDEA program, which is an entitlement program. 29 U.S.C. § 722(a)(3)(B) (2007); 34 C.F.R. § 361.42(a)(5) (2007). Therefore, the ALJ concluded:

> Even though [Mr. Takahashi] had not entered Beacon College when his mother referred him to RSA, [Mr. Takahashi] already obligated himself to attend Beacon and to pay tuition for the Fall 2005 semester. [RSA] played no role in that college application and never contracted

2. The ALJ noted in the Order Denying Reconsideration that OAH does not have the power to review DCPS's compliance with IDEA, but that nothing in the Final Order prevented Mr. Takahashi from seeking any remedy he may have under IDEA.

with [Mr. Takahashi] or the school to fund this tuition. [RSA] had no obligation to pay for [Mr. Takahashi's] tuition until it had determined his eligibility and developed a[ ] [Plan], a contract for his vocational program.

Mr. Takahashi filed a Motion to Reconsider, which was denied. He timely petitioned for review.

## II.

In reviewing an OAH decision, we may reverse only if the findings are not supported by substantial evidence in the record or if the decision is grounded on a mistaken legal premise or is an abuse of discretion. *See* D.C.Code § 2–510(a)(3)(A), (E) (2001); *Rodriguez v. Filene's Basement Inc.*, 905 A.2d 177, 180–81 (D.C.2006). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gardner v. District of Columbia Dep't of Employment Servs.*, 736 A.2d 1012, 1015 (D.C.1999) (citations omitted). Substantial evidence may exist to support a conclusion different than the one reached by the ALJ, but this court may not substitute its review of the record for that of the ALJ. *Baumgartner v. Police & Firemen's Ret. & Relief Bd.*, 527 A.2d 313, 315 (D.C.1987).

The law is also well settled that "an agency's interpretation of its own regulations or of the statute which it administers is generally entitled to great deference from this court." *Genstar Stone Prod. Co. v. District of Columbia Dep't of Employment Servs.*, 777 A.2d 270, 272 (D.C.2001) (quoting *King v. District of Columbia Dep't of Employment Servs.*, 742 A.2d 460, 466 (D.C.1999)); *see generally United States v. Mead Corp.*, 533 U.S. 218, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001); *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778,

81 L.Ed.2d 694 (1984). We will uphold the agency's interpretation unless it is unreasonable or contrary to the language or the legislative history of the statute. *McKenzie v. District of Columbia Dep't of Human Servs.*, 802 A.2d 356, 358 (D.C.2002); *see also Providence Hosp. v. District of Columbia Dep't of Employment Servs.*, 855 A.2d 1108, 1111 (D.C.2004) (concluding that unless the interpretation is plainly erroneous or inconsistent with the enabling statute, it is binding).

## III.

Mr. Takahashi contends that the ALJ erred in denying his claim that RSA should have paid his tuition for the Fall semester of 2005. Mr. Takahashi argues that the ALJ's determination was arbitrary and capricious because RSA paid for his second college semester although he had enrolled before his Plan was completed; if RSA could develop and approve the Plan for expenses previously incurred for the second semester, it could have approved funding for his Fall semester tuition for the same reason. The ALJ's conclusion that RSA had no obligation to pay for Mr. Takahashi's tuition until it had determined his eligibility for services from RSA and until the Plan was developed and a contract for his vocational program entered into, was neither arbitrary nor capricious.

Contrary to Mr. Takahashi's assertion, RSA's rationale for paying Mr. Takahashi's second semester fees and costs did not apply to paying for the first semester. RSA receives federal funding to provide authorized vocational rehabilitation services pursuant to the Rehabilitation Act, 29 U.S.C. § 713(a). Under the Rehabilitation Act, RSA is authorized to use federal funds for: (1) the provision of assessment and evaluations necessary to determine eli-

gibility and the scope of vocational services; and (2) services provided pursuant to an approved Plan. 34 C.F.R. §§ 361.42 and 361.45. In addition, RSA must determine whether an applicant is eligible to receive services within sixty days of applying for them. 29 U.S.C. § 722(a)(6). RSA failed to determine whether Mr. Takahashi was eligible to receive service benefits within sixty days after he applied. RSA conceded that the Plan was not finalized until July 2006, but should have been completed no later than December 2005. Because Mr. Takahashi had sought RSA services within a time frame to qualify for payment of his Spring semester tuition and costs, RSA agreed to pay for Mr. Takahashi's tuition and expenses at Beacon College commencing in January 2006.

However, this rationale did not apply to the Fall semester because, as Mr. Takahashi admits, he applied to and was accepted by Beacon College before learning about or applying to RSA for benefits. The Fall semester was well underway before the sixty day period for approving his Plan expired. Requiring payment under these circumstances would undermine RSA's process for developing appropriate vocational rehabilitation services envisioned by the Rehabilitation Act and allow applicants to make unilateral demands for services they have already identified and for costs they are already obligated to pay, without RSA performing the required evaluations to determine Mr. Takahashi's eligibility for such services.

It was neither arbitrary nor capricious for the ALJ to conclude that RSA was not required to grant benefits to persons who have not yet applied for benefits, particularly where RSA played no role in selecting Beacon College for Mr. Takahashi, and

he had already obligated himself to attend the school prior to contacting RSA. *See Marriott Int'l v. District of Columbia Dept't of Employment Servs.*, 834 A.2d 882, 885 (D.C.2003) (agency decision stands undisturbed unless arbitrary or capricious). RSA had a compelling rationale and strong policy reasons for not reimbursing Mr. Takahashi for the Fall Semester tuition. Applicants should not be able to circumvent the process by making unilateral decisions based upon what the individual thinks is an appropriate service and then obligate RSA to reimburse them for those services. Accordingly, the Final Order denying Mr. Takahashi's request for reimbursement from RSA for the tuition costs for his Fall Semester of 2005 at Beacon College was neither arbitrary nor capricious, and we affirm.

## IV.

Mr. Takahashi contends that the Rehabilitation Act requires RSA, as the designated state agency,[3] to identify students with disabilities who may be eligible for transition or vocational benefits, and RSA is solely responsible when the Plan has not been developed prior to that child leaving secondary school. Specifically, Mr. Takahashi asserts that the legislative history and federal implementing regulations require the development and approval of the Plan before the student leaves the secondary school setting. *See* 34 C.F.R. § 361.22(a)(2) (2006) ("these plans, policies, and procedures ... must provide for the development and approval of an individualized plan for employment ... as early as possible ... but, at the latest, by the time each student determined to be eligible for

3. The designated State agency is defined as the agency primarily concerned with vocational rehabilitation, or vocational and other rehabilitation, of individuals with disabilities. 29 U.S.C. § 721(a)(2)(B)(i).

vocational rehabilitation services leaves the school setting").[4]

The Rehabilitation Act establishes a program under which state agencies receive federal grants "to assist the states in operating statewide comprehensive ... programs, each of which is designed to assess, plan, develop and provide vocational rehabilitation services for individuals with disabilities...." 29 U.S.C. § 720(a)(2)(b). In 1993, the Rehabilitation Act was amended to provide "transition services for students, that facilitates the achievement of the employment outcome identified in the individualized plan for employment." 29 U.S.C. § 723(a)(15) (1998). To be eligible to participate in the federal vocational rehabilitation program, submission of a State plan is required. 29 U.S.C. §§ 720 and 721. The State plan "must contain plans, policies, and procedures for coordination between the designated State agency and educational officials ... to facilitate the transition of students with disabilities from receipt of educational services in school to receipt of vocational rehabilitation services under the responsibility of the designated State agency." 29 U.S.C. § 721(a)(11)(D). The Rehabilitation Act also permits the designated State agency in its State Plan to coordinate with public school education officials and designate lead agencies and together determine their roles and responsibilities. 29 U.S.C. § 721(a)(11)(D)(iii).

■ Contrary to Mr. Takahashi's argument, the ALJ determined that provisions in the Rehabilitation Act, namely 29 U.S.C. §§ 721(a)(11)(D) and 723(a)(15), did not require RSA to identify all DCPS special education students and provide the Plan for these students by the time they left the school setting. Rather, RSA's obligation under the Rehabilitation Act was to coordinate the provision of transition services with other agencies, including educational agencies, and to provide transition services to individuals who are known to RSA. The ALJ concluded that the requirement described in 34 C.F.R. § 361.22 "presupposes that the student has been identified to RSA as someone who may be eligible for RSA benefits ... for a student who has been identified to RSA, this regulation [requiring a plan to be determined prior to graduation] would certainly apply."

The ALJ's interpretation of the Rehabilitation Act and its implementing regulations is reasonable, and we will defer to it. See Pierce v. District of Columbia Police & Firefighters' Ret. & Relief Bd., 882 A.2d 199, 205 (D.C.2005). If we were to follow Mr. Takahashi's interpretation of the Rehabilitation Act and implementing regulations, RSA would be "solely" responsible for identifying disabled students without the help or coordination of any other agency. This argument is not supported by the language set forth in the Rehabilitation Act, 29 U.S.C. § 721. The provisions of the statute specifically authorize the designated state agency (RSA) to coordinate with educational and other agencies (DCPS) to create an interagency agreement that establishes a lead agency to be responsible for transition services and setting out the roles and responsibilities for each agency. See 29 U.S.C. § 721(a)(11)(D). RSA complied with this requirement and coordinated with other agencies and entered into the Agreement with DCPS and others.

Mr. Takahashi also argues that the Agreement is deficient for several reasons. He asserts that the Agreement lacks a procedure for identifying students, does not contain the word "refer" or "referral," and that the designation of DCPS as the lead agency is insufficient to satisfy the requirement for outreach and identification

4. 34 C.F.R. §§ 361.01–.89 have been promulgated to implement the Rehabilitation Act.

procedures as required by the local regulations—District of Columbia Municipal Regulations, 29 DCMR §§ 100-104, 110 (2007). RSA contends that any obligation it had to identify children with disabilities who might be eligible for RSA services was met by developing the Agreement with DCPS and other agencies, and relying upon DCPS and others to identify the students and provide referrals. The Agreement clearly includes among the responsibilities for DCPS:

- Invite a representative of any other agency that is likely to be involved with the student, after the student exits school, to the IEP meeting beginning two years prior to the student's anticipated exit
- Compile and make available to adult service providers, with written parent/guardian consent, recent medical/psychological information to be used in determining eligibility for vocational rehabilitation services and vocational planning
- Inform adult service agencies [including RSA] on an annual basis of the following:
  - Numbers of students expected to leave (graduate or exit) including those in private, non-public and residential schools
  - Disability classification of students projected to leave including general functioning level, particularly for students with developmental disabilities or mental retardation

- Projected services such as employment, *post-secondary education* /training, independent living, and recreation needed by exiting students

▇▇▇▇ The Agreement further provides among the responsibilities listed for RSA:

- Assign rehabilitation counselors to each high school and the special education citywide schools to provide a point of contact for staff, youth, and families
- Provide technical assistance to school staff, students (beginning at age 14), and families in the development of vocational and independent living goals
- Attend IEP meetings, when DCPS has provided the IEP meeting schedule as indicated above, to participate or provide input to the IEP committee at least two years prior to the student's anticipated school exit for those students expected to be eligible for vocational rehabilitation services
- Conduct a comprehensive vocational assessment when agreed to in the IEP. Psychological and/or medical assessments will be provided if they are required by RSA for planning
- Complete the Individualized Plan for Employment with eligible students

The Agreement's provisions with regard to RSA, cover all of the duties imposed by the federal statute on the local vocational services program.[5] The ALJ concluded

---

5. Mr. Takahashi also claims that the Agreement must be published in the District of Columbia Register in order to be valid. As noted by the ALJ, this issue was only raised in Mr. Takahashi's Motion for Reconsideration. Mr. Takahashi did not cite to any authority supporting this assertion, and the ALJ denied it. For the first time before us, Mr. Takahashi cites to the District of Columbia Office of Documents Act, D.C. Law 2–153 [Act 2–270],

25 DCR 6960, to provide support for his argument. The Documents Act provides for the publication in the District of Columbia Register and District of Columbia Municipal Regulations of "every rule, regulation, and document having general applicability and legal effect." *See* D.C.Code §§ 2–552(b), –553(b)(1) (2007 Supp.). There are exceptions to the general publication rule for documents having general applicability and legal effect.

that the Agreement established DCPS as the lead agency charged with identifying students with disabilities who may be entitled to transition services, including vocational rehabilitation services. This designation was entirely appropriate because DCPS had the obligation under IDEA to provide transition services to such students. 20 U.S.C. § 1412. The ALJ's determination was neither arbitrary nor capricious.

*So Ordered.*

Personnel manuals or internal staff directives solely applicable to employees or agents of the District of Columbia are expressly excluded from the publication requirement. D.C.Code § 2–551(5)(B) (2007 Supp.). The Agreement is an internal understanding among District of Columbia agencies and is solely applicable to employees or agents of the District of Columbia. Furthermore, it is not a rule or regulation. Therefore, it did not have to be published to be valid.